Caroline N. BULLOCH, McRae N. Bulloch and Kern Bulloch, Executors of the Estate of David C. Bulloch, McRae N. Bulloch and Kern Bulloch, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C–19–55.

United States District Court
D. Utah, Central Division.

Oct. 26, 1956.

---

Dan S. Bushnell (of Ralph & Bushnell), D. Christian Ronnow (of Romney, Boyer & Ronnow), Salt Lake City, Utah, for plaintiffs.

Llewellyn O. Thomas, Asst. U. S. Atty. for the Dist. of Utah, Salt Lake City, Utah, John J. Finn, Atty., U. S. Dept. of Justice, Washington, D. C., and Donald R. Fowler, Atty., Atomic Energy Commission, Albuquerque, N. M., for defendant.

CHRISTENSON, District Judge.

During the Spring of 1953, the United States Atomic Energy Commission conducted as "Operations Upshot Knothole" a series of nuclear tests at the Nevada Proving Ground, northwest of Las Vegas, Nevada. At the time of the first shot, plaintiffs' herd of sheep some fifty miles northeast of the test site was moving from the winter range in an easterly direction toward shearing and lambing grounds in the vicinity of Cedar City, Utah. During the trip, this herd was within, or near, areas of radioactive fallout resulting from some of these detonations. Following the first, and continuing more or less until after the last shot of the series, abnormal losses of sheep and lambs from the Bulloch herd were noted. Other herds in the same general vicinity suffered similar difficulties which are the subjects of companion suits.

Preliminary observations of the animals disclosed gross signs simulating the effects of beta radiation. There were other evidences which suggested damage from gamma rays. An extensive study was thereupon undertaken by cooperating governmental agencies concerning

possible effects of radiation upon these animals. The conclusion reached by the investigating agencies, with dissents on the part of three of the veterinaries participating, was that certain lesions observed on the sheep and the losses and damages suffered by them were neither caused nor substantially contributed to by radiation. A denial of liability on the part of the Government resulted in this and similar suits.

Voluminous testimony and numerous exhibits have been received in evidence. It was thought that the nature of the issues commended the most liberal exploration of the facts consistent with the substantial rights of the parties. The case was presented with high ability and diligence by counsel, and an array of distinguished and informed witnesses appeared. The Government contends that the losses suffered by the Bullochs were the natural result of unprecedented cold weather during the lambing and shearing of sheep, inadequate feeding, unfavorable winter range conditions, and infectious diseases of various types, the combined effects of which were improperly thought by some during the preliminary investigation to comprise irradiation syndromes. The plaintiffs contend that the coincidence of damage and location of the sheep in fallout areas, not only as regards the Bulloch herd but as to sheep similarly located and similarly affected, the inability of preliminary investigators to definitely rule out irradiation or to identify any other cause, the views of the three veterinaries which initially supported plaintiffs' theory in one respect or another, the measured radioactivity in samples from some of the sheep, the failure of subsequent experiments to take into account the peculiar conditions under which the sheep in question were operated, together with other claimed indications of a relationship, all established by preponderate evidence that plaintiffs' abnormal losses were proximately caused, or substantially contributed to, by radiation.

On the law phases of the case, plaintiffs assert that the damage was caused through the negligence of employees of the Government, acting within the scope of their authority and not in the exercise of any discretionary function; and that thus the Government is liable by virtue of the provisions of the Federal Tort Claims Act of August 2, 1946, Title 4, Public Law 601, 79th Congress, as amended, 28 U.S.C.A. §§ 1346, 2671 et seq. The Government contends that there was no negligence of any employee of the Government proximately causing damage to the Bulloch sheep, and that if there were any damages suffered as a result of governmental action, there could be no recovery in any event as they would be in consequence of the exercise of a discretionary function of Government. 28 U.S.C.A. § 2680(a).

I find no reason to depart from, or to repeat, my discussion of the law of the case as determined on the Government's motion to dismiss, Bulloch v. United States of America, D.C., 133 F. Supp. 885. Authoritative decisions since have confirmed the view that because negligent acts or omissions of governmental employees arise in the course of an activity the institution and policy of which are matters for governmental discretion, does not mean that on the operational level there cannot be liability on the part of the Government. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. ——; United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. ——, decision below, Eastern Air Lines v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62.

That the Government may be liable for the negligence of its agents in failing to warn herders in an area of anticipated fallout of planned detonations known to involve substantial danger to them or their property, I entertain no doubt. Not unmindful of the vital importance of nuclear experimentation to the welfare and safety of our country, there yet has been established nothing here that would justify the intentional or negligent endangering of lives or property in the course of the tests. To seek to do so would seem to compromise funda-

mental human rights for the protection of which our governmental policy is designed. Indeed, while reluctant to broadly concede the point, it was not disputed by counsel for the Government that its responsibility was to so conduct the tests as not to intentionally, wantonly or negligently endanger human lives or private property. Certainly, there was no evidence from which it might be inferred that to do so was within the discretion vested in any officer or agent of the United States.

It seems so manifest as hardly to be subject to suggestion to the contrary that those charged with security provisions in connection with the tests owed to those who might be substantially damaged by resulting radioactive fallout, the duty to use reasonable care to ascertain their whereabouts within areas to be affected and to at least give them timely warning so that they would be in a position to protect themselves and their property, if necessary. There were no advance warnings given or other precautions taken to safeguard the herders or their sheep. There was no suggestion in the evidence of any unexpected developments. Any variables with reference to direction or velocity of winds aloft would seem immaterial since the agents of the Atomic Energy Commission did not attempt to ascertain the location of the sheep with or without reference to any prospective pattern of fallout dependent upon winds. Damage, if any, which did occur from the blasts could well have been anticipated by those in charge of the tests for aught the evidence discloses.

The case turns upon whether damage did in fact occur to the Bulloch sheep as a result of atomic radiation. Looking first at the evidence indicating that the damage to the sheep was the result of radioactivity, it is true that coincidence of the period of the tests and the time of abnormal losses was persuasive at first blush. The original descriptions of the lesions and the appearance of the sheep indicated especially to the sheepmen, but also to some of the experts, that there was a possibility of some relationship. However, in considering this element, it must be recognized that radioactivity was in the air at the time, figuratively, if not actually. There must have been in the sheepmen's minds some concern about atomic radiation, with its mysterious and somewhat awesome implications. When an effort was made to reconstruct the development of the damage for the benefit of subsequent investigators—and I am convinced it was a good-faith effort on the part of the sheepmen—it was unavoidable that their views were unconsciously affected by this background.

Of the three professional men who originally suggested radiation damage, two, upon further consideration, questioned their original diagnosis. None of them claimed to be particularly qualified in the field of radiation. On the other hand, some of the best informed experts in the country expressed considered and convincing judgment that radiation damage could not possibly have been a cause or a contributing cause. One witness upon whom the plaintiffs most strongly relied, did examine the sheep prior to the arrival of other experts, but he really had no better opportunity for observation than they. At the time of his examination, there were few sick animals. Most of the animals which had theretofore died had been hauled away. On the sheep that were examined by him, most of the lesions were facial and on the eartips, and these types of lesions continued until after most of the experts doing field work had the benefit of their observation.

Plaintiffs argue that there were differences in the sheep involved in controlled experiments and the Bulloch sheep, and that by reason of these differences a finding that radioactivity was the cause of plaintiffs' damage would be possible. But the experts effectively maintained their opinions to the contrary for the most part with these differences in mind. It does not lie with the Court to question the great weight of the testimony that these differences were not determinative, in the absence of at least some evidence that they were. Moreover, if I could entertain a contrary view on

this phase of the evidence, I would be confronted with the positive testimony from those best in a position to know that the maximum amount of radioactive fallout in any area in which the sheep could have been, would have caused no damage. We would be confronted, too, with the established fact that camp horses, camp dogs, and the herders themselves, who would have been exposed to the same fallout as the sheep, experienced no effects whatsoever. There was also testimony, despite plaintiffs' theory that the March twenty-fourth shot involved maximum danger to the sheep, that in the areas where they then were there was no radioactivity above background.

The great weight of the evidence indicates, and I find, that the maximum radioactive doses to which the Bulloch sheep could have been subjected, whether as a result of direct fallout, residuals therefrom, ingestion of plants or water, or through other means, was substantially less than would have caused damage; that the expected and actual fallout in the areas in which the sheep were, or in which they could reasonably have been expected to be, was well within the permissible maximums for human or animal body tolerance; that there was no contamination of air, water or earth not consistent with benign conditions in the areas where the Bulloch sheep were located; that the signs and symptoms detected upon an examination of the sheep were not effects of radiation; and that since there was no substantial danger of damage to the sheep in question, and none occurred as a result of the Upshot-Knothole series, no negligence on the part of the Government has been established within the issues of the case. I conclude that plaintiffs are not entitled to recover herein.

Now, with reference to costs: This is an action which needed trying. There were various misconceptions that could have been cleared up only through a trial such as this. The result here, I understand, will dispose of a number of companion cases. As a result of related investigations, additional information concerning the effects of radioactive fallout has been made available. In view of all the circumstances, I do not think that it would be right to saddle upon these particular plaintiffs the considerable court costs incurred by the Government.

Counsel having indicated no objection as to form, the foregoing may be deemed the findings of fact and conclusions of law of the Court. Accordingly, the clerk is directed to enter judgment that the plaintiffs take nothing and that this action be dismissed on the merits, without the allowance of costs.